## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

| | |
|---|---|
| ROBERT FLOWERS<br>12938 Brigstock Court<br>Bristow, Virginia  20136<br><br>     Plaintiff,<br><br>        v.<br><br>NAVY FEDERAL CREDIT UNION<br>820 Follin Lane<br>Vienna, Virginia 22180<br><br>Serve:  Commonwealth of Virginia<br>       State Corporation Commission<br>       1300 East Main Street<br>       Tyler Building, 1st Floor<br>       Richmond, Virginia 23219<br><br>     Defendant. | C.A. No. _____ |

## COMPLAINT

COMES NOW THE PLAINTIFF, ROBERT FLOWERS, by counsel, and moves this Court for entry of judgment in his favor, and against the Defendant, NAVY FEDERAL CREDIT UNION, and in support of such motion alleges and avers as follows:

## NATURE OF ACTION

This action states claims for discrimination and hostile work environment, failure to hire/promote in the course of employment, and constructive discharge of employment, in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621-34 (the "ADEA") and the Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq.*

This action also states claims for discrimination and hostile work environment, failure to hire/promote, and constructive discharge, based on Plaintiff's race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*. and the Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq*.

### **PARTIES**

1.      Plaintiff Robert Flowers ("Dr. Flowers") is a resident and citizen of Prince William County in the Commonwealth of Virginia, and at all times relevant hereto, was employed by Navy Federal Credit Union in this judicial district.

2.      Dr. Flowers is an African-American/Black male, and is currently 60 years of age. At all times relevant to these claims, Dr. Flowers was more than 40 years of age.

3.      Defendant Navy Federal Credit Union ("NFCU") is a financial institution that provides banking services to its members, who are primarily affiliated with the U.S. military and Department of Defense communities, and their families.

4.      Dr. Flowers was an "employee" of NFCU within the meaning of 42 U.S.C. § 2000e(f) and Va. Code § 2.2-3905(A), and an "eligible employee" of NFCU within the meaning of 29 U.S.C. § 2611(2)(A).

5.      NFCU is an "employer" within the meaning of 42 U.S.C. § 2000e(b),  29 U.S.C. § 2611(4)(A), and Va. Code § 2.2-3905(A).

6.      NFCU is engaged in an industry affecting commerce and has had 20 or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year, within the meaning 29 U.S.C. § 2611 (4)(A); 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar

year, within the meaning of 42 U.S.C. § 2000e(b); and more than five employees for each

working day in each of twenty or more calendar weeks in the current or preceding year, within the

meaning of Va. Code § 2.2-3905.1(A).

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over Dr. Flowers' claims under the common law of

Virginia.

8.      The amount in controversy in this action exceeds the jurisdictional minimum

amount for this Court.

9.      Defendant is present in, and regularly conduct affairs and business activities in

this judicial district, in Fairfax County, in the Commonwealth of Virginia.

10.     The causes of action alleged in this action arose in this judicial district.

11.     This Court has jurisdiction over Dr. Flowers' claims under the ADEA pursuant to

29 U.S.C. § 626(c)(1); pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e,

*et seq*.; and under Virginia Human Rights Act, as amended in July 2020 by the Virginia Values

Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq.*

12.     Defendant is subject to personal jurisdiction of this Court pursuant to Va. Code §

8.01-328.1 (A)(1), (2) and (3).

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1331, 1343(4), and

1391(b)(1).

14.     Jurisdiction and venue are proper in this Court.

## PROCEDURAL STATUS

15.     Dr. Flowers filed an EEOC Charge of Discrimination with the United States

Equal Employment Opportunity Commission on March 27, 2024 alleging discrimination and

hostile work environment based on age and race (Charge No. 570-2024-02287), and a Complaint of Discrimination alleging discrimination and hostile work environment based on age and race with the Office of Attorney General – Office of Civil Rights.

16.    The EEOC issued Dr. Flowers a Right to Sue on June 13, 2025, and the Office of Attorney General – Office of Civil Rights issued Dr. Flowers a Notice of Right to File a Civil Action on July 9, 2025.

17.     This action is timely filed.

## BACKGROUND

18.    Dr. Flowers is a 60 year old, African-American/Black male.

19.    Dr. Flowers has over 30 years of IT experience, including at the executive level. He holds two Doctorate degrees (Doctor of Science in Cybersecurity, and Doctor of Philosophy, Cybersecurity Leadership) and has been recognized as an IT Subject Matter Expert.  Dr. Flowers is a certified Project Manager, certified Enterprise Architect, and has an Information Technology Infrastructure Library certification.  Dr. Flowers is a published author in his field, patented creator of cybersecurity algorithms, graduate-level IT professor, and was extraordinarily well qualified for his role at NFCU. It should be noted Dr. Flowers earned his work-related Ph.D. in 2023, which was the same year in which his managers stated he was not demonstrating professional growth. The designation of "work-related" was made by the NFCU Human Resources Department.

20.    Dr. Flowers began his employment with NFCU in October, 1997 as a Network Engineer.

21.     During his almost 27-year career at NFCU, Dr. Flowers performed his job in an exemplary manner, garnering strong performance evaluations, as evidenced by his promotions and progression during his employment.

22.     For the years 1997 – 2015, Dr. Flowers received ratings of "Exceeds Expectations" - the second highest rating available - for each of those 19 years.  Dr. Flowers was rated as "Exceptional" – the highest rating available - for each of the years 2016 – 2022.

23.     In January 2019, Dr. Flowers was promoted to the position of Assistant Vice President, Internal Controls (the position he held at the time of his separation from NFCU) reporting to Sharon Poach ("Ms. Poach"), Senior VP of Corporate Accounting.  In this position, Dr. Flowers continued to earn "Exceptional" performance ratings (the highest rating) and received raises and strong performance based bonuses.

24.     After a few years of successful ("Exceptional") performance in his Assistant VP role, Dr. Flowers sought to be promoted, and applied for several open positions within NFCU for which he was well qualified.

25.     The unofficial, but usual and accepted hiring practice at NFCU requires candidates to contact hiring managers before they officially apply for an open position.  The hiring manager will signal the preferred candidates to apply, while indicating to non-preferred candidates that they should not proceed.  Consequently, hiring managers are able to discourage African-American/Black candidates, and older candidates, from applying, leaving no official record of those interested candidates who would otherwise have applied.

26.     Dr. Flowers attempted to contact the Chief Information Officer, Anthony Gallardy ("Mr. Gallardy") (Caucasian), in an effort to comply with the unofficial practice; however, Mr. Gallardy refused to meet with Dr. Flowers and (according to the Chief Technology Officer,

Sovan Shatpathy), Mr. Gallardy repeatedly blocked Dr. Flowers' promotions/transfers to any Information Services Department opening from 2021 through 2023.

27.     Over the course of three years (2021-2023), Dr. Flowers applied for promotions and lateral transfers in five departments, but was not selected for any of the seven positions for which he officially applied despite his superior qualifications and job performance. This does not include the four additional positions for which Dr. Flowers requested to apply but was denied the opportunity.

28.     In November 2021, Dr. Flowers requested (but was denied) to apply for the position of VP, ISD Risk Officer, and officially applied for the position of VP, ISD Core Banking.  In February 2022, Dr. Flowers applied for the position of VP, ICFR SOX/Business Practices, and in March 2022, Dr. Flowers applied for the position of VP, SMD Risk Officer.

29.     Dr. Flowers did not receive an offer for any of these positions for which he applied, and in each case, a younger male candidate was chosen, two of whom were Caucasian.

30.     The VP position for which Dr. Flowers requested to apply (but was denied) also went to a younger, non-Black/African-American candidate.

31.     One of these positions – VP ICFR SOX - was awarded to Joshua Frazier  ("Mr. Frazier") over Dr. Flowers, who then became one of Dr. Flowers' direct managers.  Despite Dr. Flowers becoming the incumbent for the position in his role of AVP, Internal Controls, Mr. Frazier - a younger, less qualified Caucasian candidate - was selected instead.

32.     After Mr. Frazier's appointment, Dr. Flowers and his staff were instructed by Ms. Poach to "do everything you can" to help Mr. Frazier succeed. Mr. Frazier is Caucasian, and at least 10 years younger than Dr. Flowers.

33.    Dr. Flowers was extremely well qualified for all the roles for which he applied, and had more experience than the younger, non-African-American/Black successful candidates.

34.    Despite his disappointment at not being selected for these positions, Dr. Flowers continued to perform well in his current role, and continued to earn "Exceptional" ratings, up through 2023 (including the year after Mr. Frazier became his manager).

35.    Notwithstanding his outstanding performance, in 2023 (less than one year prior to Dr. Flowers becoming eligible for full retirement benefits under NFCU's defined pension benefit retirement program under the "Rule of 85"[1]), Dr. Flowers' managers, Mr. Frazier and Odun Fasehun ("Mr. Fasehun"), suddenly became highly critical of his performance and made implied, threatening comments about Dr. Flowers' tenure with the company.

36.    On January 18, 2023, Mr. Frazer informed Dr. Flowers that his work on a particular issue was completed successfully, but then criticized Dr. Flowers for not executing it as "perfectly" as Mr. Frazier's boss (Ms. Poach) would have preferred. Despite the criticism, Dr. Flowers received accolades from executives outside his reporting chain including written appreciation for his efforts from the Vice President of Operational Accounting, Linda Hang, and a "Celebrate You" acknowledgement that was approved by Ms. Poach for his work on this particular issue.

37.    Mr. Frazier stated he did not believe Dr. Flowers could have improved upon his performance because the department had "outgrown" him.  Since Dr. Flowers had not been advised of any performance deficiencies, and had recently received the highest rating he could earn, he, too, was at a loss on how to improve upon his already successful performance.

---

[1] Under the "Rule of 85," if the sum of an employee's age plus years of service equals 85 or more, than that individual can retire early with no reduction in pension benefits.

38.    Dr. Flowers was completely shocked and taken aback by these comments.  As set forth above, Dr. Flowers was a top performer and had never been counseled or otherwise informed of any performance related issues.  It is inexplicable that a department could "outgrow" one of its strongest performers. Mr. Frazier's comment was a reference to Mr. Flowers' age.

39.    These comments occurred approximately six weeks after Dr. Flowers received an "Exceptional" rating for his 2022 performance from Mr. Frazier.

40.    During this conversation, Dr. Flowers requested to be transferred to a new position, or to have his role transferred to different leadership.  His request was denied.

41.    Dr. Flowers' work environment continued to deteriorate, and he sought to find a new position with NFCU to continue his successful career in a different, non-hostile and non-discriminatory work environment, under leadership who would treat him fairly and legally.

42.    During a meeting with Mr. Frazier on January 18, 2023, Mr. Frazier made a comment about Dr. Flowers' "not seeing around corners," and suggested Dr. Flowers' role had outgrown him.

43.    In February 2023, Dr. Flowers requested to apply for the positions of AVP, Product and Portfolio Management, and AVP, Finance Data, but both requests were denied.  In March 2023, he was also denied the opportunity apply for the position of AVP, TDP Automation.  At least one of these positions went to a younger, non-African-American/Black candidate.

44.    Mr. Flowers was informed that the request for his transfer was denied by the Chief Finance Officer, John Collins (Caucasian).

45.    Notably, the majority of Mr. Collins' leadership team was Caucasian, including Mr. Frazier, the less experienced, younger candidate selected over Dr. Flowers for the VP ICFR SOX, and whom Dr. Flowers had been instructed to help succeed.

46.    Also in February, 2023, Mr. Frazier provided feedback that Dr. Flowers was not strategic enough. As a result, in the six months that followed, Dr. Flowers made sure to document his accomplishments, which he presented at his mid-year review.

47.    Because Dr. Flowers strongly believed, based on the conduct of NFCU and how he was being treated, that he would be fired from his current position, Dr. Flowers applied for several other jobs within the company that became available. Dr. Flowers was extremely well-qualified for all of these jobs, but received no offers.

48.    Specifically, over the course of the next few months, Dr. Flowers officially applied for three additional positions (VP, Digital Channels Risk Officer in March 2023; AVP, ISD Cloud Native Engineering Services in March 2023; and AVP, Member Strategy Operational Risk in May 2023). Even though Dr. Flowers was extremely qualified for each of these roles, all three positions were awarded to younger, less experienced, Caucasian candidates.

49.    During Dr. Flowers' pre-interview with VP Sartaj Grang ("Mr. Grang") for the AVP, ISD Cloud Native Engineering Services role on March 15, 2023, Mr. Grang asked Dr. Flowers "how long" he planned to work, and if Dr. Flowers was covered under the "old plan" or the "Rule of 85." Although Dr. Flowers confirmed his pension was governed by "old plan," he also told Mr. Grang in no uncertain terms that he planned to work until at least age 65.

50.    On June 1, 2023, Ms. Poach sent a department-wide email announcing that Dr. Flowers would be leading a new mission critical team due to his agility and ability to model high

levels of performance. In reality, this assignment was a diminishment of Dr. Flowers' prior responsibilities, characterized as a "concentrated focus."

51.      Prior to Dr. Flowers' diminished role on the CECL project and the Data Governance assignment, he had previously been the single point of contact for annual PwC audits (Navy Federal's external auditor who evaluated financial statements with ~$170B in assets), the primary point of contact for interim and periodic audits by Navy Federal Internal Audit, and the process owner for the annual SSAE 18 SOC 1 audits for all credit union vendors with financial statement impact. Dr. Flowers' 2023 Performance Assessment Report input provides a list of how expansive his list of responsibilities were prior to what Ms. Poach referred to in her June 1, 2023 department-wide announcement of Dr. Flowers' diminished capacity as a "concentrated focus."

52.      On July 19, 2023, Dr. Flowers  met with Mr. Fraizer and Mr. Fasehun for his mid-year review.  During the meeting, Dr. Flowers received only negative feedback, despite sharing a list of 10+ accomplishments he had achieved or on which he had made significant progress in just seven months. When he brought that to their attention, their feedback was, "You accomplished it, but you did not list the impact."

53.      Following that observation – which was meant to marginalize Dr. Flowers' accomplishments and place a negative spin on his documented achievements and performance - Dr. Flowers included "impact" in his year-end self-evaluation, and it was considerable. So considerable, in fact, that Dr. Flowers' accomplishments were listed in his official 2023 Performance Assessment Report. Neither Mr. Fasehun nor Mr. Frazier made any notes in that written evaluation suggesting those accomplishments (first brought to their attention in July 2023 and accomplished four months early and which they sought to minimize) were not valid or impactful.

54. During the mid-year review meeting, Mr. Fraizer and Mr. Fasehun told Dr. Flowers that his performance was barely at "meets expectations," and was "trending downward." They encouraged him to apply for other positions within NFCU.

55. The suggestion that Dr. Flowers apply for other positions, combined with the statement by Mr. Frazier and Mr. Fasehun that Dr. Flowers' performance was "trending down towards 'Does Not Meet Expectations'" was an implied threat that Dr. Flowers could be (and likely would be) terminated from his position at any time.

56. Dr. Flowers was completely taken by surprise by the false and unjustified comments regarding his performance, especially given his well-documented track record and performance achievements during his tenure with NFCU. The unsubstantiated performance concerns followed more than two decades of documented, exemplary performance.

57. The stated "concerns" regarding Mr. Flowers' performance were demonstrably false, and completely at odds with not only objective metrics regarding his actual performance, but also with the significant projects (including a $ 2-3 billion dollar initiative) NFCU had entrusted to Dr. Flowers' expertise during the performance period: especially given Ms. Poach's (Mr. Frazier and Mr. Fasehun's supervisor) glowing statements about "Rob's skills and strengths…" sent to the entire department the month prior.

58. When Dr. Flowers asked what he could do to improve, neither Mr. Frazier nor Mr. Fasehun offered any substantive response – just that he should "do better."

59. Mr. Fasehun said he routinely shares areas of improvement with his direct reports and promised to send Dr. Flowers a document outlining areas where he could improve. That never occurred.

60.    The review meeting left Dr. Flowers with the distinct impression that the unjustified and unsubstantiated criticisms were merely a pretext for discrimination, and a signal to him that his tenure with the company was in jeopardy if he elected to stay.

61.    During a subsequent one-on-one meeting with Mr. Fasehun regarding the July 19, 2023 mid-year review, Mr. Fasehun commented, "I don't know how you took that session with Josh and me so well. It was brutal! I couldn't have done that!"

62.    In that same meeting Mr. Fasehun also told Dr. Flowers, "You need to retire or get that job in ISD or the end of the year will not be good for you."

63.    On July 31, 2023, Dr. Flowers attended an off-site leadership event hosted by Ms. Poach.  During the event, Dr. Flowers spoke with Ms. Poach about the sudden assertion that his performance was deteriorating.  He specifically told Ms. Poach that he believed he was being targeted for adverse action, including because of his age, and the repeated comment that the department had "outgrown" him, and that he was being forced to accept the fact that he would not be allowed to succeed how matter how many hours he worked, how hard he worked, or how much professional growth he demonstrated, because the decision had already been made to create an environment which would force him to retire or else be terminated.

64.    Ms. Poach responded with tears in her eyes that she was truly sorry but that her "hands were tied" and there was nothing she could do to help him. This statement further convinced Dr. Flowers that he was being targeted for termination based on illegal and discriminatory factors, and not based on his performance.

65.    The fact that his  managers had, at various times, provided the same (false) message to Dr. Flowers - that the department had "outgrown" him - pointed to a coordinated campaign to get rid of him.

66.     In August 2023, Dr. Flowers applied for the position of Assistant Vice President for Business and Technology Services.  After his first interview on August 4, 2023, the hiring manager told Dr. Flowers that he was considered the #1 candidate for the job.  However, during a subsequent interview on August 14, 2023, SVP/CTO Sovan Shatpathy ("Mr. Shatpathy") asked Dr. Flowers when he planned to retire.  Dr. Flowers responded that he planned to work "for many years to come" – at least until age 65.

67.     During the second interview, Mr. Shatpathy said he was impressed with Dr. Flowers' credentials because he had not come across a candidate with Dr. Flowers' teaching, engineering, and executive experience.  He commented that with his background, Dr. Flowers would have "quite a few opportunities" once he retired.

68.     The references to Dr. Flowers' retirement plans during the interview made it clear that Dr. Flowers' age was definitely a factor being considered, and viewed as a major obstacle to his otherwise strong candidacy for the position.  Dr. Flowers did not get the position, which was filled by a younger, white applicant, despite Dr. Flowers being imminently more qualified and experienced for the role.

69.     Despite the threats to rate him as "Does Not Meet Expectations," Dr. Flowers received an overall rating of "Meets Expectations" in his 2023 annual rating. However, the lowering of Dr. Flowers' rating from "Exceptional" to "Meets Expectations" resulted in a six-figure reduction in his bonus amount.

70.     Based on the conduct of NFCU, Dr. Flowers genuinely believed that if he did not capitulate and retire, NFCU would terminate his employment based on the unjustified paper trail being created, causing him to lose the opportunity to claim his pension benefits until he turned 65 years old (*i.e.*, another seven years at that time), during which time he could

potentially be unemployed). The pension was a lucrative benefit to Mr. Flowers.  This was a risk Dr. Flowers could not afford to take.

71.     Therefore, on November 1, 2023, because he felt he had no other choice, Dr. Flowers submitted his retirement notification, effective February 1, 2024.

72.     Dr. Flowers' "retirement" was not a voluntary decision on his part, and he would have remained employed for the foreseeable future absent the illegal discrimination and unlawful pressure/creation of a hostile work environment engineered to force his retirement.

73.     Dr. Flowers' "retirement" constitutes a constructive discharge based on his age and race.

74.     NFCU has demonstrated a pattern and practice of discriminating against older employees, including engaging in conduct designed to coerce older executives to retire so that the company can make room for younger executives, and to save the company from the cost of a generous pension program that the older executives were provided long ago (but that the company no longer offers).

75.     Dr. Flowers is aware that NFCU has recently targeted other older and long-tenured high-performing leaders/executive for adverse action in precisely this same manner to try to coerce their retirements or otherwise force them out of their positions soon after the time when they met the age and service requirements under the company's defined benefits pension program:

- Tammy Wiley (VP; forced to retire from her position)

- Phil Arsenault (VP; demoted and forced to retire)

- Art Moshos (AVP; forced to retire)

- Cassandra Loman (Manager; forced to retire)

76.     They, too, received vague but threatening allegations about deterioration in performance the very same year that they were eligible to retire.

77.     After Dr. Flowers' constructive discharge, he was replaced by Sarah Paik, a non-African-American/Black employee, significantly younger than Dr. Flowers, whom Dr. Flowers hired and trained in 2018, and who reported to Dr. Flowers until 2022.

78.     In addition to the above listed employees, on December 8, 2023, Mr. Collins (CFO) sent out an email announcing the appointment of Mr. Frazier to a position reporting directly to the CFO. That position oversaw the data and technology facets of the Finance Department, previously held by an older, female employee (Debra Freeman) who was forced to quit under circumstances similar to Dr. Flowers.

**COUNT ONE -**
**DISCRIMINATION IN THE FAILURE TO HIRE/PROMOTE**
**IN VIOLATION OF THE ADEA AND THE VIRGINIA HUMAN RIGHTS ACT**

79.     The foregoing allegations are incorporated as if realleged herein.

80.     Defendant NFCU, through its agents and officers, discriminated against Dr. Flowers on account of his age in its failure to hire, promote, or even consider Dr. Flowers for positions within NFCU for which he applied or for which he requested permission to apply. This discrimination was with respect to Dr. Flowers's compensation, terms, conditions, and privileges of employment, and constituted violations of the Age Discrimination in Employment Act of

1967, as amended, and the Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq.*

81.     During the time period November 2021 – August 2023, Dr. Flowers officially applied for seven different positions across five departments, and requested to apply for four additional positions, all of which he was extremely well qualified for. Dr. Flowers was denied the opportunity to apply for the four positions, and did not receive an offer for any of the seven positions for which he officially applied.

82.     Instead of hiring (for the lateral moves) or promoting Dr. Flowers to positions for which he was extremely well qualified, six of the seven positions were given to younger, less qualified individuals.

83.     Dr. Flowers learned that Mr. Gallardy intentionally repeatedly blocked Dr. Flowers' promotions/transfers to any Information Services Department opening from 2021 through 2023.

84.     In June, 2023 Dr. Flowers was encouraged to apply for the AVP Cloud Engineering Services by Sartaj Grang (VP). That position was ultimately awarded to a less qualified, younger male. Mr. Bruck had no prior AVP experience at Navy Federal (whereas Dr. Flowers was already an AVP and applying for a lateral transfer) and fewer total years of technology experience. Dr. Flowers also had five years of Enterprise Architecture experience (the position requires technology, business, and strategic expertise) in comparison to Mr. Bruck's System Architecture background.

85.     In at least two other instances, Dr. Flowers was not selected for two promotions (VP Core Banking Services and VP/Risk Officer Digital Channels), which were ultimately awarded to a younger male and a younger female candidate. In the case of the VP Core

16

Banking, Matthew Lohmar was given the position despite lacking the educational, enterprise architecture, accounting, and cybersecurity background possessed by Dr. Flowers. In the second instance, Anna Loshkareva was awarded the VP/Risk Officer Digital Channels position with only three years of risk-specific experience. Ms. Loshkareva lacked the engineering and programming experience Dr. Flowers had attained after more than two decades of continuous service to the credit union, and he had built some of the very systems the position was intended to assess,

86.    Dr. Flowers also applied for the position of Assistant Vice President for Business and Technology Services.  After his first interview on August 4, 2023, the hiring manager told Dr. Flowers that he was considered the #1 candidate for the job.  However, during a subsequent interview on August 14, 2023, SVP/CTO Sovan Shatpathy asked Dr. Flowers when he planned to retire, and commented that with his background, Dr. Flowers would have "quite a few opportunities" once he retired.

87.    The job was awarded to a less experienced, younger candidate.

88.    During Dr. Flowers' pre-interview with Mr. Grang for the AVP, ISD Cloud Native Engineering Services role on March 15, 2023, Mr. Grang asked Dr. Flowers "how long he planned to work, and if Dr. Flowers was covered under the "old plan" or the "Rule of 85."

89.    During a meeting with Mr. Fasehun in July 2023, Mr. Fasehun told Dr. Flowers, "You need to retire or get that job in ISD or the end of the year will not be good for you."

90.    The references to Dr. Flowers' retirement plans during the interview process made it clear that Dr. Flowers' age was a factor being considered, and viewed as a major obstacle to his otherwise strong candidacy for the position.  Dr. Flowers did not get these

positions, which were filled by younger applicants, despite Dr. Flowers being imminently more qualified and experienced for the roles.

91.    Defendant took these adverse employment actions against Dr. Flowers because of his age, and Dr. Flowers was treated differently, was discriminated against, and was not considered for, hired or promoted into any of the positions for which he applied, based on his age.

92.    NFCU has demonstrated a pattern and practice of discriminating against older employees, including engaging in conduct designed to coerce older executives to retire so that the company can make room for younger executives, and to save the company from the cost of a generous pension program that the older executives were provided long ago (but that the company no longer offers).

93.    Dr. Flowers is aware that NFCU has recently targeted other older and long-tenured high-performing leaders/executives for adverse action in precisely this same manner to try to coerce their retirements or otherwise force them out of their positions soon after the time when they met the age and service requirements under the company's defined benefits pension program, including Tammy Wiley (VP; forced to retire from her position); Phil Arsenault (VP; demoted and forced to retire); Art Moshos (AVP; forced to retire); Cassandra Loman (Manager; forced to retire); and Debra Freeman (forced to quit).

94.    On information and belief, these individuals were terminated/forced to retire based on their ages, and positions were filled by younger, less qualified individuals.

95.    Given Dr. Flowers's performance and level of responsibility for NFCU, his previous experience, and his education and training, there was no legitimate reason for not even considering or interviewing him for the positions he was denied the opportunity to apply for, and

it is inexplicable that he would not receive an offer for any of the seven positions he officially applied for.

96.     This conduct by Defendant was actuated by malice, spite and ill-will; was willful and wanton, and evinced conscious disregard for the federally and statutorily protected rights of Dr. Flowers.

97.     Defendants engaged in these discriminatory practices willfully, within the meaning of Section 7(b) of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 626(b), and in violation of the Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq.*

98.     As a direct and proximate result of this discrimination, Dr. Flowers has suffered and continues to suffer injury including past and future loss of income and benefits of employment, and other past and future pecuniary losses.

99.     Due to the willfulness of Defendants' conduct, Dr. Flowers is also entitled to liquidated damages under the ADEA, and punitive damages under the Virginia Human Rights Act.

### COUNT TWO - DISCRIMINATION/HOSTILE WORK ENVIRONMENT/ CONSTRUCTIVE DISCHARGE IN IN VIOLATION OF THE ADEA AND THE VIRGINIA HUMAN RIGHTS ACT

100.    The foregoing allegations are incorporated as if realleged herein.

101.    Dr. Flowers enjoyed an almost 27-year career at NFCU, and received ratings of "Exceeds Expectations" for his first 19 years, and "Exceptional" for the seven years after that, in addition to a steady career progression.

102.    Notwithstanding his outstanding performance, in 2023 (less than one year prior to Dr. Flowers becoming eligible for full retirement benefits under NFCU's defined pension

benefit retirement program under the "Rule of 85," Dr. Flowers' managers, Mr. Frazier and Mr. Fasehun suddenly became highly critical of his performance and made implied, threatening comments about Dr. Flowers' tenure with the company.

103.    Notably, Mr. Frazier was promoted over Dr. Flowers in mid-2022, becoming Dr. Flowers' manager, after which Dr. Flowers and his staff were instructed by Ms. Poach to "do everything you can" to help Mr. Frazier succeed. Mr. Frazier is at least 10 years younger than Dr. Flowers.

104.    On January 18, 2023, Mr. Frazer informed Dr. Flowers that his work on a particular issue was completed successfully, but then criticized Dr. Flowers for not executing it as "perfectly" as Mr. Frazier's boss (Ms. Poach) would have preferred. However, Mr. Frazier stated he did not believe Dr. Flowers could have improved upon his performance because the department had "outgrown" him.

105.    These comments occurred approximately six weeks after Dr. Flowers received an "Exceptional" rating for his 2022 performance.

106.    During this conversation, Dr. Flowers requested to be transferred to a new position, or to have his role transferred to different leadership.  His request was denied.

107.    Dr. Flowers' work environment continued to deteriorate, and he sought to find a new position with NFCU, in order to continue his successful career in a different non-hostile, non-discriminatory work environment, under leadership which would treat him fairly and legally.

108.    In February 2023, Dr. Flowers requested to apply for the positions of AVP, Product and Portfolio Management, AVP, and AVP, Finance Data, but both requests were

denied.  In March 2023, he was also denied the opportunity apply for the position of AVP, TDP

Automation.  At least one of these positions went to a younger candidate.

109.    Also in February, 2023, Mr. Frazier provided feedback that Dr. Flowers was not

strategic enough. As a result, in the six months that followed, Dr. Flowers made sure to

document his accomplishments, which he presented at his mid-year review.  However, the fact

that his managers, at various times, provided the same (false) message to Dr. Flowers (that the

department had "outgrown" him) pointed to a coordinated campaign to get rid of him.

110.    Because Dr. Flowers strongly believed, based on the conduct of NFCU and how

he was being treated, that he would be fired from his current position, Dr. Flowers applied for

several other jobs within the company that became available. Dr. Flowers was extremely well-

qualified for all of these jobs, but received no offers.

111.    Specifically, over the course of the next few months, Dr. Flowers officially

applied for three additional positions (VP, Digital Channels Risk Officer in March 2023; AVP,

ISD Cloud Native Engineering Services in March 2023; and AVP, Member Strategy Operational

Risk in May 2023).  Despite the fact that Dr. Flowers was extremely qualified for each of these

roles, all three positions were awarded to younger employees.

112.    During Dr. Flowers' pre-interview with Mr. Grang for the AVP, ISD Cloud

Native Engineering Services role on March 15, 2023, Mr. Grang asked Dr. Flowers "how long"

he planned to work, and if Dr. Flowers was covered under the "old plan" or the "Rule of 85."

Although Dr. Flowers confirmed his pension was governed by "old plan," he also told Mr. Grang

in no uncertain terms that he planned to work until at least age 65.

113.    On June 1, 2023, Ms. Poach sent department-wide email announcing that Dr.

Flowers would be leading a new mission critical team due to his agility and ability to model

21

high levels of performance, however in reality, this assignment was a diminishment of Dr.

Flowers' prior responsibilities, characterized as a "concentrated focus."

114.    On July 19, 2023, Dr. Flowers met with Mr. Fraizer and Mr. Fasehun for his  mid-year review.  During the meeting Dr. Flowers received only negative feedback, despite sharing a list of 10+ accomplishments he had achieved or made significant progress on in just seven months. When he brought that to their attention, their feedback was, "You accomplished it, but you did not list the impact."  Following that observation – which was meant to marginalize Dr. Flowers' accomplishments and place a negative spin on his documented achievements and performance - Dr. Flowers included "impact" in his year-end self-evaluation, and it was considerable.

115.    During the mid-year review meeting, Mr. Fraizer and Mr. Fasehun told Dr. Flowers that his performance was barely at the "meets expectations," and was "trending downward." They encouraged him to apply for other positions within NFCU.

116.    The statement by Mr. Frazier and Mr. Fasehun that Dr. Flowers' performance was "trending down towards 'Does Not Meet Expectations'" was an implied threat that Dr. Flowers' could be terminated at any time.

117.    The stated "concerns" regarding Mr.  Flowers' performance were demonstrably false, and completely at odds with not only objective metrics regarding his actual performance, but also the very important projects (including a $ 2-3 billion dollar initiative) NFCU had entrusted to Dr. Flowers' expertise during the performance period.

118.    At the end of the meeting, Mr. Fasehun stated that Dr. Flowers' performance was barely at "meets expectations," and was "trending downward." When Dr. Flowers asked what he could do to improve, neither Mr. Frazier nor Mr. Fasehun offered any substantive response – just that he should "do better."

119.     The review meeting left Dr. Flowers with the distinct impression that the unjustified and unsubstantiated criticisms were merely a pretext for discrimination, and a signal to him that his tenure with the company was in jeopardy if he elected to stay.

120.     During a subsequent one-on-one meeting with Mr. Fasehun regarding the July 19, 2023 mid-year review, Mr. Fasehun commented, "I don't know how you took that session with Josh and me so well. It was brutal! I couldn't have done that!"  Although Mr. Fasehun promised to share areas of improvement with Dr. Flowers, he never did.

121.     In that same meeting Mr. Fasehun also told Dr. Flowers, "You need to retire or get that job in ISD or the end of the year will not be good for you."

122.     On July 31, 2023, Dr. Flowers attended an off-site leadership event hosted by Ms. Poach.  During the event, Dr. Flowers spoke with Ms. Poach about the sudden assertion that his performance was deteriorating.  He specifically told Ms. Poach that he believed he was being targeted for adverse action, including because of his age, and the repeated comment that the department had "outgrown" him, and that he was being forced to accept the fact that he would not be allowed to succeed how matter how many hours he worked, how hard he worked, or how much professional growth he demonstrated, because the decision had already been made to create an environment which would force him to retire or else be terminated.

123.     Ms. Poach responded with tears in her eyes that she was truly sorry but that her "hands were tied" and there was nothing she could do to help him. This statement further convinced Dr. Flowers that he was being targeted for termination based on illegal and discriminatory factors, and not based on his performance.

124.     In August 2023, Dr. Flowers applied for the position of Assistant Vice President for Business and Technology Services.  After his first interview on August 4, 2023, the hiring

manager told Dr. Flowers that he was considered the #1 candidate for the job.  However, during a subsequent interview on August 14, 2023, SVP/CTO Sovan Shatpathy asked Dr. Flowers when he planned to retire.  Dr. Flowers responded that he planned to work "for many years to come" – at least until age 65.

125.    During the interview, Mr. Shatpathy said he was impressed with Dr. Flowers' credentials because he had not come across a candidate with both Dr. Flowers' teaching, engineering and executive experience. He commented that with his background, Dr. Flowers would have "quite a few opportunities" once he retired.  Dr. Flowers did not respond.

126.    The references to Dr. Flowers' retirement plans during the interview process made it clear that Dr. Flowers' age was a factor being considered, and viewed as a major obstacle to his otherwise strong candidacy for the positions.  Dr. Flowers did not get the positions, which were filled by younger applicants, despite Dr. Flowers being imminently more qualified and experienced for the role.

127.    Dr. Flowers ultimate received an overall rating of "Meets Expectations" in his 2023 annual rating. The lowering of Dr. Flowers' rating from "Exceptional" to "Meets Expectations" resulted in a six-figure reduction in his bonus amount.

128.    Based on the conduct of NFCU, Dr. Flowers genuinely believed that if he did not capitulate and retire, NFCU would terminate his employment based on the unjustified paper trail being created, causing him to lose the opportunity to claim his pension benefits until he turned 65 years old (*i.e.*, another seven years at that time, during which time he could potentially be unemployed). This was a risk Dr. Flowers could not afford this take.

129.    Therefore, on November 1, 2023, because he felt he had no other choice, Dr. Flowers submitted his retirement papers, effective February 1, 2024.

130.    Dr. Flowers' "retirement" was not a voluntary decision on his part, and he would have remained employed for the foreseeable future absent the illegal discrimination and unlawful pressure/creation of a hostile work environment engineered to force his retirement.

131.    Dr. Flowers' "retirement" constitutes a constructive discharge based on his age.

132.    NFCU discriminated against Dr. Flowers in the terms of his employment, subjected him to a hostile work environment, and constructively terminated Dr. Flowers because of his age.

133.    This conduct by Defendant was actuated by malice, spite and ill-will, was willful and wanton, and evinced conscious disregard for the federally and statutorily protected rights of Dr. Flowers.

134.    Defendant engaged in these discriminatory practices willfully, within the meaning of Section 7(b) of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 626(b), and in violation of the Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq.*

135.    As a direct and proximate result of this discrimination and hostile work environment, Dr. Flowers has suffered and continues to suffer injury including past and future loss of income and benefits of employment, and other past and future pecuniary losses.

136.    Due to the willfulness of Defendant's conduct, Dr. Flowers is also entitled to liquidated damages under the ADEA, and punitive damages under the Virginia Human Rights Act.

**COUNT THREE -**
**DISCRIMINATION IN THE FAILURE TO HIRE/PROMOTE ON THE BASIS OF**
**RACE IN VIOLATION OF TITLE VII AND THE VIRGINIA HUMAN RIGHTS ACT**

137.    The foregoing allegations are incorporated as if realleged herein.

138.    Defendant NFCU, through its agents and officers, discriminated against Dr.

Flowers on account of his race (African-American/Black) in its failure to hire, promote, or even

consider Dr. Flowers for positions within NFCU for which he applied or for which he requested

permission to apply. This discrimination was with respect to Dr. Flowers's compensation, terms,

conditions, and privileges of employment, and constituted violations of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §2000e, *et seq*.,  and the Virginia Human Rights Act, as amended

in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et*

*seq*.

139.    During the time period November 2021 – August 2023, Dr. Flowers officially

applied for seven different positions across five departments, and requested to apply for four

additional positions, all of which he was extremely well qualified for. Dr. Flowers was denied

the opportunity to apply for the four positions, and did not receive an offer for any of the seven

positions for which he officially applied.

140.    Instead of hiring (for the lateral moves) or promoting Dr. Flowers to positions for

which he was extremely well qualified, six of the seven positions were given to Caucasian

candidates.

141.    Dr. Flowers learned that Mr. Gallardy intentionally blocked Dr. Flowers'

promotions/transfers to any Information Services Department opening from 2021 through 2023.

142.    In June, 2023 Dr. Flowers was encouraged to apply for the AVP Cloud

Engineering Services by Sartaj Grang (VP). That position was ultimately awarded to a less

qualified, Caucasian male. Mr. Bruck had no prior AVP experience at Navy Federal (whereas Dr. Flowers was already an AVP and applying for a lateral transfer) and fewer total years of technology experience. Dr. Flowers also had five years of Enterprise Architecture experience (the position requires technology, business, and strategic expertise) in comparison to Mr. Bruck's System Architecture background.

143.    In at least two other instances, Dr. Flowers was not selected for two promotions (VP Core Banking Services and VP/Risk Officer Digital Channels), which were ultimately awarded to a white male and a white female. In the case of the VP Core Banking, Matthew Lohmar was given the position despite lacking the educational, enterprise architecture, accounting, and cybersecurity background possessed by Dr. Flowers. In the second instance, Anna Loshkareva was awarded the VP/Risk Officer Digital Channels position with only three years of risk-specific experience. Ms. Loshkareva lacked the engineering and programming experience Dr. Flowers had attained after more than two decades of continuous service to the credit union, and he had built some of the very systems the position was intended to assess,

144.    Dr. Flowers also applied for the position of Assistant Vice President for Business and Technology Services.  After his first interview on August 4, 2023, the hiring manager told Dr. Flowers that he was considered the #1 candidate for the job.  Despite this, the job was awarded to a less experienced, Caucasian candidate.

145.    Dr. Flowers was treated differently, subjected to adverse employment actions, and was not hired or promoted into any of the positions for which he applied, based on his race (African-American/Black).

146.    Given Dr. Flowers's performance and level of responsibility for NFCU, his previous experience, and his education and training, there was no legitimate reason for not even

considering or interviewing him for the positions he was denied the opportunity to apply for, and it is inexplicable that he would not receive an offer for any of the seven positions he officially applied for.

147.    This conduct by Defendant was actuated by malice, spite and ill-will; was willful and wanton, and evinced conscious disregard for the federally and statutorily protected rights of Dr. Flowers.

148.    Defendants engaged in these discriminatory practices willfully, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.,* and in violation of the Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq.*

149.    As a direct and proximate result of this discrimination, Dr. Flowers has suffered and continues to suffer injury including past and future loss of income and benefits of employment, and other past and future pecuniary losses.

150.    Due to the willfulness of Defendants' conduct, Dr. Flowers is also entitled to punitive damages pursuant to Title VII, and under the Virginia Human Rights Act.

## COUNT FOUR -
## DISCRIMINATION/HOSTILE WORK ENVIRONMENT/
## CONSTRUCTIVE DISCHARGE ON THE BASIS OF RACE
## IN VIOLATION OF TITLE VII AND THE VIRGINIA HUMAN RIGHTS ACT

151.    The foregoing allegations are incorporated as if realleged herein.

152.    Dr. Flowers enjoyed an almost 27-year career at NFCU, and received ratings of "Exceeds Expectations" for his first 19 years, and "Exceptional" for the seven years after that, in addition to a steady career progression.

153.    Notwithstanding his outstanding performance, in 2023, Dr. Flowers' managers Mr. Frazier (who was promoted over Dr. Flowers in mid-2022, becoming Dr. Flowers'

manager, after which Dr. Flowers and his staff were instructed by Ms. Poach to "do everything

you can" to help Mr. Frazier succeed) and Mr. Fasehun suddenly became highly critical of his

performance and made implied, threatening comments about Dr. Flowers' tenure with the

company.

154.    On January 18, 2023, Mr. Frazer informed Dr. Flowers that his work on a

particular issue was completed successfully, but he was criticized for not executing it as

"perfectly" as Mr. Frazier's boss (Ms. Poach) would have preferred. However, Mr. Frazier stated

he did not believe Dr. Flowers could have improved upon his performance because the

department had "outgrown" him.

155.    These comments occurred approximately six weeks after Dr. Flowers received an

"Exceptional" rating for his 2022 performance.

156.    During this conversation, Dr. Flowers requested to be transferred to a new

position, or to have his role transferred to different leadership.  His request was denied.

157.    Dr. Flowers' work environment continued to deteriorate, and he sought to find a

new position with NFCU, in order to continue his successful career in a different non-hostile,

non-discriminatory work environment, under leadership who would treat him fairly and legally.

158.    In February 2023, Dr. Flowers requested to apply for the positions of AVP,

Product and Portfolio Management, AVP, and AVP, Finance Data, but both requests were

denied.  In March 2023, he was also denied the opportunity apply for the position of AVP, TDP

Automation.  At least one of these positions went to a non -Black/African-American candidate.

159.    Also in February, 2023, Mr. Frazier provided feedback that Dr. Flowers was not

strategic enough. As a result, in the six months that followed, Dr. Flowers made sure to

document his accomplishments, which he presented at his mid-year review.  However, the fact

that his managers, at various times, provided the same (false) message to Dr. Flowers (that the department had "outgrown" him) pointed to a coordinated campaign to get rid of him.

160.    Because Dr. Flowers strongly believed, based on the conduct of NFCU and how he was being treated, that he would be fired from his current position, Dr. Flowers applied for several other jobs within the company that became available. Dr. Flowers was extremely well-qualified for all of these jobs, but received no offers.

161.    Specifically, over the course of the next few months, Dr. Flowers officially applied for three additional positions (VP, Digital Channels Risk Officer in March 2023; AVP, ISD Cloud Native Engineering Services in March 2023; and AVP, Member Strategy Operational Risk in May 2023). Despite the fact that Dr. Flowers was extremely qualified for each of these roles, he did not receive any offers, and all three positions were awarded to non-Black/African-American candidates.

162.    On June 1, 2023, Ms. Poach sent department-wide email announcing that Dr. Flowers would be leading a new mission critical team due to his agility and ability to model high levels of performance, however in reality, this assignment was a diminishment of Dr. Flowers' prior responsibilities, characterized as a "concentrated focus."

163.    On July 19, 2023, Dr. Flowers met with Mr. Fraizer and Mr. Fasehun for his mid-year review. During the meeting Dr. Flowers received only negative feedback, despite sharing a list of 10+ accomplishments he had achieved or made significant progress on in just seven months. When he brought that to their attention, their feedback was, "You accomplished it, but you did not list the impact." Following that observation – which was meant to marginalize Dr. Flowers' accomplishments and place a negative spin on his documented achievements and performance - Dr. Flowers included "impact" in his year-end self-evaluation, and it was considerable.

164.    During the mid-year review meeting, Mr. Fraizer and Mr. Fasehun told Dr. Flowers that his performance was barely at the "meets expectations," and was "trending downward." They encouraged him to apply for other positions within NFCU.

165.    The statement by Mr. Frazier and Mr. Fasehun that Dr. Flowers' performance was "trending down towards 'Does Not Meet Expectations,'" combined with the suggestion that he look for another position, was an implied threat that Dr. Flowers' could be (and likely would be) terminated at any time. When Dr. Flowers asked what he could do to improve, neither Mr. Frazier nor Mr. Fasehun offered any substantive response – just that he should "do better."

166.    The stated "concerns" regarding Mr. Flowers' performance were demonstrably false, and completely at odds with not only objective metrics regarding his actual performance, but also the very significant projects (including a $ 2-3 billion dollar initiative) NFCU had entrusted to Dr. Flowers' expertise during the performance period.

167.    The review meeting left Dr. Flowers with the distinct impression that the unjustified and unsubstantiated criticisms were merely a pretext for discrimination, and a signal to him that his tenure with the company was in jeopardy if he elected to stay.  Mr. Fasehun later commented, "I don't know how you took that session with Josh and me so well. It was brutal! I couldn't have done that!"  Although Mr. Fasehun promised to share areas of improvement with Dr. Flowers, he never did.

168.    On July 31, 2023, Dr. Flowers spoke with Ms. Poach about the sudden assertion that his performance was deteriorating, and his belief he was being targeted for adverse action, and that he was being forced to accept the fact that he would not be allowed to succeed how matter how many hours he worked, how hard he worked, or how much professional growth he demonstrated, because the decision had already been made to create

an environment which would force him to retire or else be terminated. Ms. Poach responded with tears in her eyes that she was truly sorry but that her "hands were tied" and there was nothing she could do to help.

169.    This statement further convinced Dr. Flowers that he was being targeted for termination based on illegal and discriminatory factors, and not based on his performance.

170.    After Dr. Flowers' first interview for the position of Assistant Vice President for Business and Technology Services on August 4, 2023, the hiring manager told Dr. Flowers that he was considered the #1 candidate for the job.  Despite this, the job was awarded to a less experienced, Caucasian candidate.

171.    Dr. Flowers ultimate received an overall rating of "Meets Expectations" in his 2023 annual rating. The lowering of Dr. Flowers' rating from "Exceptional" to "Meets Expectations" resulted in a six-figure reduction in his bonus amount.

172.    Based on the conduct of NFCU, Dr. Flowers genuinely believed that if he did not capitulate and retire, NFCU would terminate his employment based on the unjustified paper trail being created, causing him to lose the opportunity to claim his pension benefits until he turned 65 years old (*i.e.*, another five years, during which time he could potentially be unemployed). This was a risk Dr. Flowers could not afford this take.

173.    Therefore, on November 1, 2023, because he felt he had no other choice, Dr. Flowers submitted his retirement papers, effective February 1, 2024.

174.    Dr. Flowers' "retirement" was not a voluntary decision on his part, and he would have remained employed for the foreseeable future absent the illegal discrimination and unlawful pressure/creation of a hostile work environment engineered to force his retirement.

175.    Dr. Flowers' "retirement" constitutes a constructive discharge based on his race.

176.    Dr. Flowers was discriminated against Dr. Flowers in the terms of his employment, and subjected him to a hostile work environment and constructively terminated Dr. Flowers because of his race (African-American/Black).

177.    This conduct by Defendant was actuated by malice, spite and ill-will, was willful and wanton, and evinced conscious disregard for the federally and statutorily protected rights of Dr. Flowers.

178.    Defendant engaged in these discriminatory practices willfully, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq*., and in violation of the Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq.*

179.    As a direct and proximate result of this discrimination, Dr. Flowers has suffered and continues to suffer injury including past and future loss of income and benefits of employment, and other past and future pecuniary losses.

180.    Due to the willfulness of Defendant's conduct, Dr. Flowers is also entitled to punitive damages under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*. and pursuant to the Virginia Human Rights Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff ROBERT FLOWERS requests that this Court enter judgment in his favor, and against Defendant NAVY FEDERAL CREDIT UNION on the above stated Counts; and further:

(a)      Award Dr. Flowers compensatory damages to be determined by a jury, plus demonstrated past and future pecuniary damages on the above-stated Counts One through Four; and in addition

(b)      Award Dr. Flowers liquidated damages under the ADEA on Counts One and Two;

(c)      Award Dr. Flowers punitive damages under Title VII on Counts Three and Four per the statutory cap; and in addition

(d)      Award Dr. Flowers punitive damages under the Virginia Human Rights Act/Virginia Values Act on Counts One, Two, Three, and Four per the statutory cap; and in addition

(e)      Award Dr. Flowers attorneys' fees and the costs of this action; and in addition

(f)      Award injunctive relief consisting of an order prohibiting the Defendant from engaging in further employment practices that create or tolerate a discriminatory and hostile work environment; and in addition

(g)      Award Dr. Flowers such other and further relief as may be appropriate under the circumstances.

## <u>JURY DEMAND</u>

PLAINTIFF ROBERT FLOWERS DEMANDS A TRIAL BY JURY.

September 10, 2025                          Respectfully submitted,

                                            */S/ CARLA D. BROWN*
                                            Carla D. Brown, VSB No. 44803
                                            cbrown@cbcblaw.com
                                            CHARLSON BREDEHOFT COHEN
                                              BROWN& NADELHAFT, P.C.
                                            11260 Roger Bacon Drive, Suite 201
                                            Reston, Virginia 20190
                                            (703) 318-6800  Telephone
                                            (703) 318-6808  Facsimile
                                            *Counsel for Plaintiff, Robert Flowers*